NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LAKE COUNTY ASSOCIATION FOR
THE RETARDED, INCORPO-
RATED, Respondent.

No. 96–3535.

United States Court of Appeals,
Seventh Circuit.

Argued May 15, 1997.

Decided Nov. 13, 1997.

Elizabeth Kinney, National Labor Rela-
tions Board Region 13, Chicago, IL, Aileen
A. Armstrong, Margaret Gaines Neigus, Na-
tional Labor Relations Board Appellate
Court, Enforcement Litigation, Washington,
DC, Jeffrey Lawrence Horowitz (argued),
National Labor Relations Board, Washing-
ton, DC, for Petitioner.

Michael A. Luvisi (argued), Donna King Perry, Woodward, Hobson & Fulton, Louisville, KY, for Respondent.

Before CUDAHY, MANION and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

The National Labor Relations Board (NLRB or the Board) applies to us for enforcement of its unfair labor practice order issued against the Lake County Association for the Retarded, Inc. (Lake County). Lake County opposes the application on the grounds that the NLRB improperly disregarded certain stipulations to which Lake County and the United Automobile, Aerospace, and Agricultural Equipment Workers of America (UAW) agreed, and that the NLRB selected an inappropriate bargaining unit. For the reasons discussed below, we grant the NLRB's request for enforcement.

## I. Background

When a union seeks to organize a company, the enthusiasm of its employees commonly varies based on where they work and what they do. The unevenness of support can powerfully shape how the union and the company would choose to define the appropriate electoral unit. The union will naturally favor including as many pro-union workers as possible, and cordoning off workers likely to oppose it. The employer just as naturally will want the opposite.

The arbiter in this conflict is the NLRB, charged under Section 9(b) of the National Labor Relations Act (the Act) with the power to define the appropriate bargaining unit. 29 U.S.C. § 159(b). After the NLRB has ruled what the appropriate bargaining unit is, it may direct an election. If the union wins, the employer can refuse to bargain-but the union can then petition the NLRB to order the employer to enter into collective bargaining. If the NLRB so orders the employer, the employer may decline. The NLRB may then petition the Court of Appeals for enforcement. Only then may the employer challenge the union's certification. *See gen-*

*erally* 4 Theodore Kheel, *Labor Law* § 14.01 (1997); 2 *id.* § 7.04.

Such is the posture of this case. The employer is Lake County, a non-profit corporation that cares for the mentally retarded in Lake County in northwest Indiana. In January 1995, the UAW called for an election at Lake County. An NLRB officer held hearings in late January and mid-February on the appropriate bargaining unit. The investigation was aligned along two axes. The first was the horizontal. The employees of Lake County essentially work in two settings, residential and day services. Those in residential services care for four to six clients in 34 group homes. Those in day services work at five "sheltered workshops," where they train Lake County's clients in a broad spectrum of skills, from sewing to socializing. The UAW originally had it in mind to seek certification of a bargaining unit of employees only from the residential side. Lake County countered that the bargaining unit ought to embrace workers from both sides in a "wall-to-wall" unit. The logic of the conflict was plain: the UAW stated it would not proceed to an election if the NLRB accepted Lake County's proposed wall-to-wall unit, presumably because the UAW thought it would lose. From what we can tell from the hearing transcripts, Lake County and the UAW had not considered other options.

The other axis was the vertical. We say vertical because, as a general matter of labor law, the closer someone's slot is to management, the less likely she is to be included in a bargaining unit as an "employee," as the Act defines the term. Thus the Act excludes supervisors, 29 U.S.C. § 152(3), managerial employees, *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 268–69, 94 S.Ct. 1757, 1759–60, 40 L.Ed.2d 134 (1974), and certain non-managerial confidential employees, *NLRB v. Hendricks County Rural Elec. Membership Corp.*, 454 U.S. 170, 190, 102 S.Ct. 216, 228, 70 L.Ed.2d 323 (1981). *See generally* 4 Kheel, *supra*, at § 14.02[2]. Lake County and the UAW disagreed somewhat over which kinds of jobs—such as residential supervisors, medical assistants or behavioral specialists—would be included in whatever bargaining unit the NLRB decided upon. As will

become pertinent later, their disagreement was bookended by the law governing what categories were eligible to be counted as employees. So, with these questions essentially constrained by the law, stipulations were quite feasible. And, with the disagreement mapped out along these two axes, the case went for a decision to the NLRB's Acting Director for Region 13 (the Acting Director).

The Acting Director surprised both Lake County and the UAW: she defined a bargaining unit smaller than either party had anticipated. She first classified Lake County's jobs as entry level, expert, and ancillary:

### Entry level

*Residential*: residential supervisor, relief supervisor, program assistant, ARS facilitator, semi-independent living trainer

*Day*: workshop supervisor, training aide, lead supervisor, social integration program supervisor, social integration program technician, vocational trainer, kitchen supervisor, recreation manager, recreation supervisor, shipping/receiving supervisor, janitorial supervisor, social integration program lead technician, adult day activity supervisor

### Expert

*Residential*: residential nurse, residential LPN, counselor, individual program coordinator, behavior specialist

*Day*: nurse, social worker, enrichment trainer, employee integration trainer

### Ancillary

*Residential*: maintenance worker, area clerk, residential social secretary, accounting clerk

*Day*: maintenance worker, truck driver, clerical employee

The entry level positions require no degree or formal training, and pay $6.49 per hour. The expert category consists of employees required to possess degrees in their areas of specialization; these employees are generally salaried, earning between $18,000 and $25,000 per year. Ancillary employees such as accounting clerks generally do not work directly with clients. Employees in the expert and ancillary categories generally work Monday through Friday from 9 a.m. to 4:30 p.m., as do entry level day services employees. Certain employees in the expert category are required to be on call at other times as well.

On the horizontal axis, the Acting Director agreed with Lake County that a residential-only bargaining unit (favored by the UAW) failed to embrace a "community of interest," the Board's catch-phrase for a group of employees whose interests line up enough to make a coherent bargaining unit, *see NLRB v. Action Automotive, Inc.*, 469 U.S. 490, 494, 105 S.Ct. 984, 987, 83 L.Ed.2d 986 (1985). Too many commonalities bridged residential and day services, she held, to allow for simply divorcing the two halves. Residential and day workers did the same work (often side-by-side), with the same education and skills, for similar pay and benefits and under the same overall supervision. No real distinction divided maintenance employees working on the same task or clerks sitting in the same office, beyond the formal labels of residential and day.

The Acting Director also conceded that the wall–to–wall unit that Lake County endorsed did constitute a community of interest. Still she did not approve it. Instead she chose a bargaining unit limited to workers in residential services, but one smaller than residential workers as a whole. The key shift was on the vertical axis. The difficulty with the UAW's proposed unit was that too many commonalities crossed the residential/day divide. The Acting Director solved these problems by lopping off the expert and ancillary employees. She thus limited the unit to the five hands-on entry level residential positions.

While not what the UAW had asked for, the certified bargaining unit proved attractive enough for the UAW to go ahead with an election. It won, 83 to 61. Lake County argues that the Acting Director drew (and the NLRB approved) an electoral unit that defies law, fact and common sense. Lake County's chief argument is that the NLRB breached the express stipulations of the parties, and that the electoral unit is therefore void. Lake County's fallback is that the certified bargaining unit has no community of interest.

## II. Stipulations

■ Lake County cites several points in the lengthy hearings when the UAW and it entered into overt stipulations. The question is to what were they stipulating. To answer that, we must look to the context of the stipulations. Here is the key passage (there are other passages to which Lake County adverts, but they make the same point):

> HEARING OFFICER: The parties have agreed that of the—I believe it is 21 employee classifications we know of on the residential side, a majority of them are properly within the unit, and I therefore propose the following stipulation.
>
> . *That within any appropriate unit, any unit found appropriate herein by the Regional Director, the employees employed in the following classifications shall be included in that unit:* Residential Supervisor, Program Assistant, Program Assistant II, Relief II, Area Clerk, Maintenance, SILP Trainer, SILP Trainer II, Residential/Social Services Secretary, Residential LPN, Health Assistant, Health Assistant II, Department of Accounting Clerk, and Medical Assistant.

Hearing Transcript at 7 (emphasis added); *see also* H.T. at 102, 204–11, 609–10, 705. The parties adopted this stipulation.

To lay out Lake County's syllogism: the parties explicitly stipulated that any unit would include that list of jobs. Yet the unit that the Acting Director came up with does not include all these jobs. The NLRB therefore overreached by ignoring the stipulation without any justification under NLRB policy or statutory command.

But the passage quoted above strongly suggests that Lake County and the UAW assumed in making the stipulation that the unit would either be residential-only, the UAW choice, or all-inclusive, Lake County's preference. In either case, all the named *eligible* employees in the *residential* unit would be included. The purpose of the stipulation was to determine which employee classifications would be included, no matter how the unit was structured horizontally, with the assumption that the horizontal structure would be either Lake County's choice or the UAW's choice. Thus, when the NLRB officer opened the hearings, he already knew that he could not reconcile UAW and Lake County on the horizontal question—residential vs. residential-and-day. The officer instead focused on winnowing down the remaining discord over the vertical question. The question was essentially which job classes qualified as "employees" under the Act, whatever unit the Acting Director chose. This was certainly a more feasible goal than trying to reconcile the horizontal preferences of the parties.

Hence the hearing officer introduced his proposed stipulations by saying: "Keeping in mind [that] both parties reserve their positions at the moment in entering into these stipulations as to whether the unit shall consist of just residential and/or residential and day side, but I propose—*with respect to the residential side, I propose the following stipulation.*" H.T. at 6 (emphasis added). He then proffered, and the parties accepted, four stipulations. All four sorted various jobs as in or out of the bargaining unit; and three were explicitly premised on whether the jobs fit the Act's definition of employee. The first stipulation was that a number of jobs were supervisory under the Act, and thus would not be part of the bargaining unit: Area Supervisor, House Manager/ Social Worker, Director of Residential Services, etc. Then came the second stipulation, which we quoted above, placing the enumerated low-ranking jobs within the bargaining unit. Then followed a third stipulation of still more supervisors and managerial employees, such as the Directors of Health and Safety and of Client Services. And finally came the fourth: that a last group qualified as confidential employees (Personal Secretary, Executive Secretary, Personnel Coordinator and the like). They, too, would not be part of the bargaining unit. We find the evidence strong that these stipulations were cataloguing these jobs in accordance with the Lake County hierarchy as in or out of whichever of two electoral units the Acting Director selected.

Yet when the Acting Director made her decision on the shape of the bargaining unit, she opted for a configuration that neither side had advocated. She started with a residential-only unit (presumably where

the union would pursue the election), but eliminated the more expert and high-skilled job categories (because if these were included, their counterparts on the day side would also, on community interest principles, have to be included). There is no doubt that the Acting Director violated the stipulations read literally and out of context, but it is much less clear that the Acting Director offended the spirit and intent of the stipulations. The interest of Lake County in the stipulations was presumably to exclude ineligibles. Now that the NLRB has selected a unit smaller than that either party proposed, these stipulations have lost their relevance to the changed context. In fact, the NLRB respected the stipulations' vertical purpose: dividing the workers into eligibles and non-eligibles for membership in the unit. The NLRB did not pull anyone from the top and insert her in the unit (i.e., include any stipulated supervisory or managerial workers). Nor did it remove someone from the bottom and exclude her (i.e., exclude an employee on the grounds that she did not qualify as an employee under the Act). The NLRB thus has not violated the spirit of the stipulations.

■ If the stipulations of the parties had been pursuant to a consent-election agreement, in which the employer and a union agree to a description of the appropriate bargaining unit, as well as other details of a certification election, see 29 U.S.C. § 159(c)(4); 29 C.F.R. § 102.62, the literal terms of the parties' stipulations would be entitled to greater weight. The law in this circuit is crystal clear that once a union and a

company stipulate to the appropriateness of a bargaining unit in a consent-election agreement, that stipulation demands great respect from the NLRB. See, e.g., NLRB v. J.J. Collins' Sons, Inc., 332 F.2d 523, 525 (7th Cir.1964). In such a case, the NLRB is not making an "independent determination of a proper bargaining unit"; it is "construing a contract." NLRB v. Joclin Mfg. Co., 314 F.2d 627, 633 (2d Cir.1963) (Friendly, J.). In this case, however, unlike all of the cases dealing with stipulations cited by the appellant, there was a fundamental disagreement between the parties on the appropriate bargaining unit.[1] We see no reason to view the stipulations as a binding contract under the circumstances of this case.[2]

## III. Community of Interest

■ The Board did nonetheless craft a bargaining unit that neither Lake County nor the UAW had proposed. We are therefore left with Lake County's fallback argument: that the NLRB abused its discretion in defining the bargaining unit as it did.

■ The lodestar in a challenge to the NLRB's determination of an appropriate bargaining unit remains *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), in which the Supreme Court said "[t]he issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion, and the decision by the

1. The deference shown to stipulations in consent election agreements has been extended to stipulations outside that context when the employer and the union agree to an appropriate bargaining unit. See *NLRB v. O'Daniel Trucking Co.*, 23 F.3d 1144, 1149 (7th Cir.1994). In *O'Daniel*, however, the employer did not contest the appropriateness of the bargaining unit during the hearing. It agreed with the union that the unit for which the union petitioned was appropriate, if the employer's collective bargaining agreement with another union did not bar the union's petition. *Id.* at 1147. After the Board determined that there was no contract bar to the union's petition, the employer argued that the bargaining unit was not appropriate. This court concluded that "the stipulation was binding on the Board and the parties irrespective of whether the 'com-

munity of interest test' was satisfied." *Id.* at 1149.

2. Lake County argues that the stipulations foreclosed exploration during the hearing of relevant issues associated with the bargaining unit ultimately selected by the NLRB. But Lake County suggests no specific information that it was foreclosed from presenting that contradicts the NLRB's findings; Lake County simply challenges the Board's analysis. Nor can Lake County argue that NLRB policy prevents the Board from selecting a bargaining unit different from the ones proposed by the parties. See *State Farm Mut. Auto. Ins. Co. v. NLRB*, 411 F.2d 356, 361 (7th Cir.1969) (en banc).

Board, if not final, is rarely to be disturbed." *Id.* at 491, 67 S.Ct. at 792.

■■■ The NLRB purports to determine the appropriate bargaining unit for this election in accordance with its long-established community of interest doctrine: "The Board's primary concern is to group together only those employees who have substantial mutual interests in wages, hours, and other conditions of employment," *Fifteenth Annual Report of the National Labor Relations Board* 39 (1950). *See* Acting Director's Decision (ADD) at 4.[3] Our review is limited to whether the NLRB's decision "is a reasonable application of its 'community of interest' standard." *NLRB v. Action Automotive, Inc.,* 469 U.S. 490, 496, 105 S.Ct. 984, 988, 83 L.Ed.2d 986 (1985). The same company may include several or even many communities of interest. Under the Act the NLRB is not obliged to pick the "most appropriate bargaining unit" but only a unit that is "appropriate under all the circumstances." *NLRB v. Western Temp. Servs., Inc.,* 821 F.2d 1258, 1267 (7th Cir.1987).

In this case, despite the Acting Director's explicit findings cataloguing similarities between the working conditions of entry level day and residential employees—

> For the entry level positions, there is no difference in qualifications between the day services and residential divisions. Hiring for all facilities, both day and residential, is done at the Employer's main offices.... According to [Lake County's Executive Director Kris] Prohl, the primary determinant for whether an applicant will be hired for the day or residential division is the hours that applicant is available to work.
>
> The Employer applies identical policies to all employees in both division[s]. Employees in both divisions receive the same benefits such as pension, personal leave,

sick days, vacation, medical and life insurance, bereavement pay, medical leave of absence, military leave of absence, and a grievance procedure. Employees in both divisions are subject to the same policies on discipline. New employees in both divisions are oriented together at one of the Employer's day facilities. Periodic training of incumbent employees is also conducted among combined groups of day and residential employees.

ADD at 4—the Board has given powerful weight to the work schedules of the entry level residential employees, in order to distinguish them from entry level day employees and other employees. The residential entry level employees

> work under unique conditions not shared by other employees. They alone interact with the clients on a daily basis in the clients' homes. Employees in these classifications work unusual work schedules, and have differing job concerns from other employees as a result. Some of these classifications, particularly the residential supervisors, relief supervisors, and ARS facilitators, are required to live with the clients, and to remain on the job, even when not being paid, during sleep times. Such conditions are not applicable to other classifications of employees in either the day or residential division. I find these unusual conditions, under which the employees' jobs extend into the most personal details of their lives, creates a separate community of interest not shared by other employees.

ADD at 5. It could be argued that the NLRB accords excessive weight to one aspect of the entry level residential employees' working conditions.[4] The community of interest doctrine, however, does not specify the weight to be given to various aspects of

---

**3.** References to the NLRB include the decision of the Acting Director on March 23, 1995, since the NLRB affirmed the Acting Director's decision on November 30, 1995.

**4.** Lake County points out that only three of the five residential entry level positions actually live with the clients. But it is not unreasonable for the NLRB to find that the other residential entry level employees who assist those employees and

have the same entry level status, *see* ADD at 2, fall within a single community of interest. Lake County is not arguing that the employees who actually live with the clients have a community of interest, so the only issue is whether inclusion of the other residential entry level employees establishes that the NLRB's decision was arbitrary. We are not persuaded that it does.

employee working conditions. The NLRB's decision is supported by substantial evidence; it is not our role to second-guess the weighing of that evidence by the NLRB. *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 42, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987) ("[I]f the Board's application of ... a rational rule [consistent with the Act] is supported by substantial evidence on the record, courts should enforce the Board's order."); *Action Automotive,* 469 U.S. at 496–97, 105 S.Ct. at 988–89 ("[W]e do not make labor policy under § 9(b); Congress vested that authority in the Board, which brings its extensive experience in the administration of the Act to bear on questions of unit determinations.... We ... are not prepared to second-guess the Board's informed judgment...."). This is not a case like *Continental Web Press, Inc. v. NLRB,* 742 F.2d 1087 (7th Cir.1984), in which "the Board apparently ... reversed a long-established presumption in favor of combining pressmen and preparatory employees into a single unit of lithographic production workers," *id.* at 1092, without explanation. We suggest that in future cases of this type, the Board spell out explicitly why any unusual work conditions are a critical factor in determining community of interest. *Cf.* ADD at 5 (quoted above). But this lapse in an otherwise carefully reasoned report does not resemble the situation described in *Continental Web Press,* in which the differences in working conditions identified by the NLRB [5] were on their face highly implausible grounds for demarcating distinct communities of interest, and the NLRB offered no explanation for the relevance of the differences, 742 F.2d at 1092. Lake County invites us to review a number of NLRB decisions dealing with, for example, broadcasting and lodging companies and social service entities, to infer that in this case, like *Continental Web Press,* the

NLRB has capriciously, or with bias or prejudice, violated its own established policy. It argues that the cases it cites establish a Board policy of placing all employees in a single unit when the functions of the employees are highly integrated. But in fact the NLRB has taken integration into account in rejecting the UAW's desired unit, and none of the cited decisions establishes that integration must outweigh other considerations, such as unusual working conditions. Lake County criticizes the Board's choice of boundaries, but those that the NLRB drew are not "clearly inappropriate," *Western Temp. Servs.,* 821 F.2d at 1267.

Ultimately what irks Lake County is its suspicion that the NLRB rigged a bargaining unit so that the UAW would hold an election. The Acting Director settled upon two possible communities of interest, the wall-to-wall unit and the five jobs on the residential side. She took the latter, explaining as follows: "Because the [UAW] has already indicated that it does not wish to proceed to an election in an overall unit, I will not direct an election in that unit. I am, however, directing an election in the narrower unit." Lake County therefore makes a colorable claim that the union's preferences influenced the Acting Director.

■ If the law forbade the NLRB from considering a union's wishes, Lake County would stand on firmer ground. But the law does not. Federal courts have treated the union's wishes under the phrase, "extent of organization," drawn from Section 9(c)(5) of the Act.[6] And they have ruled that the NLRB may consider the extent of organization as one factor, so long as it is not the "controlling factor." *NLRB v. Metropolitan Life Ins. Co.,* 380 U.S. 438, 441–42, 85 S.Ct. 1061, 1063–64, 13 L.Ed.2d 951 (1965).

---

**5.** The only differences in working conditions at Continental Web's printing plant that the Board ... mentioned were the different hours of starting work (the presses have to be warmed up before they can run), and the fact that (1) most of the pressmen wear smocks, while none of the preparatory employees do; (2) the groups have different employee handbooks; and (3) pressroom time cards are designated by the number 103 but preparatory department time cards by the number 102.... All these differences seem

small and unimportant, and the third seems utterly trivial.

*Continental Web Press,* 742 F.2d at 1092.

**6.** Section 9(c)(5) of the Act provides that "[i]n determining whether a unit is appropriate for the purposes specified in subsection (b) of this section the extent to which the employees have organized shall not be controlling." 29 U.S.C. § 159(c)(5).

The NLRB has not devised a "crude gerrymander," *S.D. Warren Co. v. NLRB*, 353 F.2d 494, 498 (1st Cir.1965). A factor is not "controlling" merely because, if it were given no weight, the result would be different. It is controlling if no other factor plays a significant role in determining the outcome. In our judgment, whether the union might hold an election was a factor in how the NLRB laid out the bargaining unit, but not the controlling one: The Acting Director rejected the UAW's real desire, the residential-only option. She was unsure whether the UAW would even want to hold an election for her new, more compact unit—giving the UAW the option of withdrawing its petition before the NLRB.

The application of the NLRB for enforcement is

GRANTED.